# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KAREN H. SCOTT  )  <br>    1523 28th Street SE  ) <br>    Apartment A2  ) <br>    Washington, D.C. 20020  ) <br>    )<br>    Plaintiff,  ) <br>v.  ) <br>    ) <br>DISTRICT HOSPITAL  ) <br>PARTNERS, L.P.  ) <br>    900 23rd Street NW  ) <br>    Washington, D.C. 20037  ) <br>    ) <br>as owner and operator of  ) <br>    ) <br>GEORGE WASHINGTON  ) <br>UNIVERSITY HOSPITAL  ) <br>    900 23rd Street NW  ) <br>    Washington, D.C. 20037  ) <br>    ) <br>    Serve registered agent:  ) <br>    CT Corporation Systems  ) <br>    Suite 1000  ) <br>    1015 15th Street NW  ) <br>    Washington, D.C. 20005  ) <br>and  ) <br>    ) <br>UHS OF DELAWARE, INC.  ) <br>    900 23rd Street NW  ) <br>    Washington, D.C. 20037  ) <br>    ) <br>    Defendants.  ) <br>    ) <br>    Serve registered agent:  ) <br>    CT Corporation Systems  ) <br>    1015 15th Street NW  ) <br>    Washington, D.C. 20005  ) | Case No. _____ <br><br><br>JURY TRIAL DEMANDED |

# COMPLAINT

## I. NATURE OF THE CASE

1. This is a case brought by the plaintiff, after exhausting her administrative remedies with the Equal Employment Opportunity Commission (EEOC) for violations of the Americans with Disabilities Act (ADA) and Title VII of the Civil Rights Act of 1964 as amended for race discrimination, for hostile work environment creation and maintenance in violation of those statutes, for retaliation for her filing internal complaints and persisting in seeking correction of these matters and for seeking accommodation of her disability and also, should her federal complaints not be successful, for wrongful discharge under District of Columbia law.  Plaintiff's letter of Notice of Discharge by the EEOC and Right to Sue was dated February 6, 2013, and was received by plaintiff (only) several days later.   Plaintiff seeks compensation for her monetary damages, her emotional distress and psychological harm and punitive damages for the willful nature of the harms perpetrated against her as ratified, joined and adopted at the highest management levels of the defendant hospital.

## II. JURISDICTION AND VENUE

2.  Jurisdiction exists in this Court because this is a federal issue case under the provisions of the Americans with Disability Act (ADA) 42 U.S.C. § 12101 *et seq* and under Title VII of the Civil Rights Act of 1964 as amended 42 U.S.C. § 2000e *et seq*.  Venue exists in this Court because all of the events complained of herein occurred in the District of Columbia and the plaintiff and all defendants reside in or have a presence in the District of Columbia.

## III. PARTIES

3.  The plaintiff is an African-American female who resides in the District of Columbia and did so at all times pertinent hereto. She resides at the address given in the style of the case

above.  She is a certified Licensed Practical Nurse (LPN) in the District of Columbia and was so at all pertinent times.  She was employed at the George Washington University Hospital (GWUH) as an LPN working in the Case Management Department as set out in the details *infra* until she was terminated as set out in detail below.  The title she was given in her position at GWUH was Case Management Associate.

4. The defendant District Hospital Partners, L.P. is a District of Columbia limited partnership which since 1997 has owned GWUH.   The partnership is 80% owned by Universal Health Systems, Inc. of King of Prussia, Pennsylvania and 20% owned by the George Washington University.  Universal Health Systems, Inc. owns major interests in over 100 health care facilities nationwide.

5.  The defendant UHS of Delaware, Inc. is a wholly owned subsidiary of Universal Health Systems, Inc. and as such is called the latter's management company and does dominate the management of GWUH.  It entered this case while it was before the EEOC.

## IV. BACKGROUND FACTS COMMON TO ALL COUNTS

6.  Plaintiff, as a Licensed Practical Nurse (LPN), was employed by the defendant District Hospital Partners L.P. d/b/a George Washington University Hospital (GWUH) doing office work consisting in large part of processing information to enable the hospital to get paid by insurance providers, a task in which she had been trained and in which she was experienced. See Exhibit 1 to this Complaint which is incorporated herein by reference.

7.  She was hired on August 1, 2007 and was given the title of Case Management Associate in what was called the Case Management Department which was under the directorship and supervision of an employee of GWUH named Clial Beth Reinhart.

3

8. The task that the plaintiff was asked to do required that the plaintiff communicate to and from not only insurance companies but also physicians, patients, families and the "healthcare team[s]." Plaintiff was known at the time of her hiring by Ms. Reinhart as testified to by Ms. Reinhart in Exhibit 1.

9. Prior to the plaintiff's being hired at GWUH, the job which the plaintiff performed during her time at GWUH was done by a woman who had been hired as a secretary but who was trained by people at GWUH to do the job which the plaintiff then took over when the plaintiff was hired and performed thereafter until she was terminated as set out further below.

10. When the plaintiff was hired at GWUH she was placed under the immediate supervision of Clial Beth Reinhart as stated above. Ms. Reinhart had obtained an RN degree through an online institution.

11. Ms. Reinhart, as stated above and shown in Exhibit 1, had been familiar with the work of the plaintiff for several months prior to the plaintiff's being hired at GWUH and recommended to GWUH that it hire the plaintiff. At that point the plaintiff and Ms. Reinhart were on friendly terms and no friction had occurred between them.

12. Working with Ms. Reinhart during this initial period at GWUH when the plaintiff and Ms. Reinhart were working cooperatively together in a relationship of professed mutual respect, the plaintiff, at the very outset, worked with Ms. Reinhart to craft a position description to fit the work that the plaintiff was doing. This description was derived, on Ms. Reinhart's part, largely from descriptions available for GWUH social workers in a "cut and paste" effort by Ms. Reinhart. A copy of that position description, dated July 30, 2007, is attached as Exhibit 2 to this complaint and incorporated herein by reference.

4

13. In crafting this initial job description part of the description which was particularly suited to the plaintiff's capabilities inasmuch as the plaintiff was a certified LPN and with her training and experience brought to the job an ability to complete reviews and manage the overflows of medical information.

14. During her initial months on the job at GWUH the plaintiff was able to work cooperatively with Ms. Reinhart and during that period Ms. Reinhart frequently told the plaintiff that the monthly reports reflected the plaintiff's work on retro-reviews showing that the plaintiff had recovered or saved GWUH millions in what would have been "lost" revenue.  The plaintiff received favorable ratings from Ms. Reinhart and pay increases.

15. The plaintiff was compelled to work in an inner, small, closed office, not accessible to the "floor."  This office had very poor air quality with virtually no circulation of the air and what air did come in through ducts which were not clean as the air brought with it a black dust that settled on the closely situated desks, so that it was visible and could be wiped with one's figures.  The only door from this inner office, which had another inner office off it, to the outside world and the "floor" was through a door which the plaintiff's supervisor, Ms. Reinhart, insisted be kept locked.

16. The bad air quality in this inner office where the plaintiff was compelled to work, with its close quarters and locked door and lack of any air circulation and black dust, caused the plaintiff increasingly to experience times when she literally could not breathe and could not work so as to perform her job.  Her nose would bleed, her eyes swell shut, her lips swell and her face discolor and swell up.

17. After suffering for many months from the bad air which frequently rendered her unable to breathe and to work, the plaintiff began to complain of the conditions and requested

5

that an accommodation be made to alleviate them, such as opening the door, cleaning the ducts, and even creating additional ventilation.

18. The only responses the plaintiff received from Ms. Reinhart to these requests were promises to rearrange the furniture, promises which were never kept.

19. Others confined to these close quarters were also affected by the bad air.

20. One fellow worker was so affected by the bad air and the refusals to do anything about it that she quit her job at GWUH and returned to her native Alabama to seek employment there where she would not be compelled to endure such conditions.

21. The plaintiff went to the doctor and learned that what she was suffering from was a serious matter.  Doctors whose advice she sought gave her notes which she provided to GWUH excusing the plaintiff from having to work under such "trigger[ing]" conditions and a doctor from Georgetown Medstar Hospital gave her a report giving the specific disease code of her affliction, known is the physician's reference as "shortness of breath," which is a serious disability rendering those who suffer from it unable to breathe and work under the conditions plaintiff was compelled to work under.  Plaintiff showed this report to GWUH personnel who certainly knew or should have known from the number code from Georgetown and the doctors' notes the seriousness of this disability for those who suffer under it such as the plaintiff.

22. Matters began to come to a head with an incident that occurred on April 1, 2010, when the plaintiff, unable literally to breathe and work, propped open the door from the inner, close offices where she was compelled to work to the outside offices and world so that she was able to breathe and work.

22. On that occasion the immediate supervisor of the plaintiff and GWUH, Ms. Reinhart, the head of Case Management, as the unit where the plaintiff worked was called, discovered the

propped open door and began to upbraid the plaintiff in a loud, startling tone that the plaintiff had not before experienced during her earlier months of cooperative work with Ms. Reinhart.

23. When the plaintiff told Ms. Reinhart that she could not breathe and tried to explain her medical condition Ms. Reinhart told her she was crazy and began a tirade of abusive and degrading comments that from that point on changed the work environment into a hostile one in which the plaintiff's numerous requests to make accommodations to relieve her disability such as keeping the door to the outer offices open, cleaning the ducts, and creating new openings to allow fresh air to circulate were greeted with sudden, unexpected outbursts and tirades from Ms. Reinhart. These outbursts and tirades would happen all at once; Ms. Reinhart would be in a seemingly pleasant mood when all of a sudden Ms. Reinhart would change demeanor and turn into a raving angry person.

24. This hostility toward the plaintiff by Ms. Reinhart continued and intensified during the ensuing months as the plaintiff continued to request accommodations as described to allow the air to circulate so that she could breathe and work in the close quarters. Among other things, Ms. Reinhart stopped giving the plaintiff 8 hours of overtime each week, as she had been doing during the initial months when the plaintiff and Ms. Reinhart were working cooperatively. This overtime pay the plaintiff had been using to finance online courses with Excelsior University. Ms. Reinhart did not stop giving such overtime to the plaintiff's mate, Glenna Aaron, who was white and who sat next to the plaintiff in the small office. Without the extra pay to pay for schooling the plaintiff applied for tuition to take courses at GW itself but under Ms. Reinhart's influence no reply was ever given to this request.

25. During these months also Ms. Reinhart began to force the firing and leaving of a number of African-American women employees and see to their replacement with non-African-

American employees.  In one case the employee so forced to leave was a dark skinned woman of Filipiña descent.   These employees thus forced out were all attractive women.  Ms. Reinhart was obsessed with being young, frequently boasting about being young and wearing short skirts and otherwise dressing younger than appropriate to her age.

26. Ms. Reinhart often behaved unprofessionally in her relations and talks and togetherness with her immediate supervisor, a Mr. Davis, who, like herself, was married, and it became commonly thought among the staff working with Ms. Reinhart that there was more than a professional relationship between Ms. Reinhart and Mr. Davis.

27. Others also complained about Ms. Reinhart and Ms. Reinhart's discrimination and outbursts.  Plaintiff has it on information and belief that others formally complained about Ms. Reinhart.  Eventually Ms. Reinhart left GWUH in part, plaintiff has it on information and belief, because of her getting GWUH into trouble and bringing it under hostile complaints and actions.  It is believed that she has left the jurisdiction and her whereabouts at present are unknown to the plaintiff.

28. The plaintiff herself complained through internal procedures about Ms. Reinhart's discrimination but the Human Resources person to whom she complained,  Erin K. Fagan, while holding a meeting with both Ms. Reinhart and the plaintiff present, refused to listen when the plaintiff spoke of these problems and mentioned specific behavior by Ms. Reinhart, instead turning her face to the wall and pointedly refusing to hear what the plaintiff was saying.

29. Eventually, the plaintiff took her complaints over the head of Ms. Reinhart to Ms. Reinhart's immediate superior, Mr. Davis and to the Medical Director of GWUH, Dr. Gary Little.  Both of them ignored her request and immediately had the Assistant Director of Human Resources notify the plaintiff that she was being fired.

30. In the meantime, in the last month of her employment at GWUH, November 2010, the defendants, being engaged in reorganization compelled by a federal law enacted in 2009, had Ms. Reinhart put out a pretextual Project Plan for Case Management Services, November, 2010, which purported to reorganize plaintiff's position out of existence as no longer functional and being necessarily replaced by a different function which supposedly required an RN degree.

31. This was a complete fabrication. This new Plan, like the original job description worked out between the plaintiff and Ms. Reinhart before their cooperation ceased and the hostile work environment began, was copied largely from Social Worker requirements having nothing to do and no relationship with the course work and training for an RN degree and on its face created no new requirements that required an RN degree rather than an LPN certification. There is nothing that an RN is doing in this position that the plaintiff was not doing when she was terminated. In fact while there the plaintiff was tasked with training RNs to be able to do what she did.

32. The plaintiff was then in fact replaced by a white RN whose work output was no different than that of the plaintiff, to which the plaintiff can testify, as she subsequently had occasion to see that output weekly when working for some months at another location with another entity. This entire so-called reorganization was, as regarded the plaintiff, a flimsy pretext contrived to create a false pretext for discharging her in retaliation for the plaintiff's having insisted on accommodation for her disability. No RN capability was required to perform the same work as the plaintiff had done.

33. Within days of being discharged the plaintiff, acting *pro se*, went to the EEOC Washington Field Office and interviewed there, subsequently immediately filing charges of discrimination based on race and religion under Title VII of the Civil Rights Act of 1964 as

amended and also on age discrimination under the Age Discrimination in Employment Act (ADEA).  Within the first three hundred days the plaintiff filed, through newly retained counsel a first amended Charge on the required EEOC form in which she dropped the claim of religious discrimination and added a claim for hostile work environment.

34.   In her initial interview with an intake officer at the EEOC the plaintiff supplied documents and answered a questionnaire which showed unmistakably (her questionnaire answers not becoming available to her until much latter after she obtained new counsel, her EEOC Charge was dismissed, and she filed a Freedom of Information Act request) that the plaintiff had been discriminated against on the basis of her disability and had been the victim of retaliation when she expanded her continuous efforts to obtain accommodations for her disability.

35.   Subsequently, after obtaining new counsel the plaintiff sought, under the doctrine of relation back as set out in EEOC regulations, to amend her charge further to add counts of retaliation and violation of the Americans with Disability Act (ADA).  The plaintiff filed a formal motion to make this second amendment to her charge along with a new charge form and exhibits.

36.   Plaintiff and her counsel met with the assigned investigator at the Washington Field Office of the EEOC and also the counsel there and argued vigorously for the relating back amendment but that attempt was denied based on a judgment, *inter alia*, that her disability was not serious, a judgment not informed by any qualified medical opinion.  And, further, even if Ms. Reinhart had caused some discharges of African-American GWUH employees, others remained when the plaintiff was let go.  Of course, even if such discrimination based on race was being practiced by Ms. Reinhart, it stopped when Ms. Reinhart herself left GWUH.

## IV. COUNT ONE: VIOLATIONS OF THE AMERICANS WITH DISABILITY ACT

37. Plaintiff incorporates herein by reference all the allegations from paragraphs 1 through 36 above as fully as they were set out in this Count.

38. As set out the defendants systematically discriminated against the plaintiff because of her disability of shortness of breath as it is known which rendered her unable to breathe and work in the close office environment that she was compelled to work in with no air circulation and continual introduction of a black dust.

39. This having to work in the environment which triggered her disability caused the plaintiff great distress and ultimately led to her being let go as she continued unsuccessfully to try to get an accommodation from the defendants so that she would not continually be unable to breathe and work in the close environment.

40. This discrimination based on her disability, which increased as the plaintiff complained about it and sought accommodation to eliminate it led to the plaintiff's being terminated in retaliation.

41. The discrimination and the continual effort to try and work when she could not breathe much of the time, suffered severe symptoms and could not work caused the plaintiff great pain and suffering and caused her great psychological and emotional distress as she struggled to try to survive and work.

42. When discharged ultimately as a result of this discrimination because of her disability the plaintiff was only able to find new work for a matter of months and as a direct result is today unemployed and has been unable to further her education as she had been continuing to pursue it when the discrimination made it impossible for her do so.

43. Plaintiff believes that her difficulties resulting from the said discrimination against her at GWUH have resulted directly in her not getting any favorable response to many, many job applications that she has filed for job openings announced in her field.

44. All of this has led to the plaintiff's having to undergo great pain and suffering, both for the period when she was under discriminating attack by Ms. Reinhart and the defendants at GWUH and continuing thereafter until the present time.

WHEREFORE, the plaintiff prays in this Count One, for monetary damages in an amount of no less than two hundred and fifty thousand dollars ($250,000), damages for mental, emotional and psychological suffering in an amount of no less than one hundred thousand dollars ($100,000) and damages for pain and suffering in the amount of no less than seven hundred and fifty thousand dollars ($750,000) and also for punitive damages because of the willful and malicious nature of the discriminatory actions of Ms. Reinhart on behalf of GWUH as ratified and adopted and joined in by her superiors when they were apprised of those actions in an amount of no less than seven hundred and fifty-thousand dollars ($750,000).

Further the plaintiff prays that she be allowed and awarded all of her costs of preparing and pursuing this claim, to include exhausting her administrative remedies before the EEOC to include all counsel fees in accordance with the Laffey Matrix as provided for by statute and any expert witness fees that might have been required.

## V. COUNT TWO: VIOLATIONS OF TITLE VII OF THE CIVIL RIGHTS ACT OF 1964 AS AMENDED IN VIOLATION OF THE PROHIBITION AGAINST RACE DISCRIMINATION

45. Plaintiff incorporates herein by reference all the allegations from paragraphs 1 through 36 above as fully as if they were set out in this Count.

46. Clial Beth Reinhart, whose actions in this regard were ratified and adopted by the defendants, systematically discriminated against the plaintiff and at least four others based on their race or national origin, to assure that they were let go from GWUH and replaced with non-minority individuals.

47. This systematic race and national origin based discrimination was in violation of Title VII of the Civil Rights Act of 1964 as amended.

48. This firing based on race and national origin in a systematic way was only interrupted when Clial Beth Reinhart left the employ of GWUH.

49. These actions caused the same damages and types of damages set out above in Count IV, paragraphs 39 through 44 which the plaintiff hereby incorporates in this Count the same as if their words were set out herein.

WHEREFORE, the plaintiff prays in this Count Two for monetary damages in an amount of no less than two hundred and fifty thousand dollars ($250,000), damages for mental, emotional and psychological suffering in an amount of no less than one hundred thousand dollars ($100,000) and damages for pain and suffering in the amount of no less than seven hundred and fifty thousand dollars (($750,000) and also for punitive damages because of the willful and malicious nature of the discriminatory actions of Ms. Reinhart on behalf of GWUH as ratified and adopted and joined in by her superiors when they were apprised of those actions in an amount of no less than seven hundred and fifty-thousand dollars ($750,000).

Further the plaintiff prays that she be allowed and awarded all of her costs of preparing and pursuing this claim, to include exhausting her administrative remedies before the EEOC to include all counsel fees in accordance with the Laffey Matrix as provided for by statute and any expert witness fees that might have been required.

## VII. COUNT THREE: VIOLATIONS OF THE PLAINTIFF'S RIGHT TO BE FREE OF A HOSTILE WORK ENVIRONMENT

50. Plaintiff incorporates herein by reference all the allegations from paragraphs 1 through 36 above as fully as if they were set out in this Count.

51. Clial Beth Reinhart, with her actions fully adopted and ratified by the defendants, commenced her maintenance of a hostile work environment for the plaintiff commencing before the incident of April 1, 2010 but intensifying dramatically thereafter until she was able to obtain the discharge of the plaintiff at the instance of the managers of GWUH including Mr. Davis and Doctor Little acting through Erin K. Fagan as the Assistant Director of Human Resources.

52. This hostile work environment was maintained because of the disability of the plaintiff and the plaintiff's attempts to obtain accommodation to alleviate her disability and because of the plaintiff's race and age.

53. This action of maintaining a hostile work environment for the plaintiff because of the discrimination against her based on her disability, her race and also her age of 56 caused the same damages and types of damages set out above in Count IV, paragraphs 39 through 44 which the plaintiff hereby incorporates in this Count the same as if their words were set out herein

WHEREFORE, the plaintiff prays in this Count Three for monetary damages in an amount of no less than two hundred and fifty thousand dollars ($250,000), damages for mental, emotional and psychological suffering in an amount of no less than one hundred thousand dollars ($100,000) and damages for pain and suffering in the amount of no less than seven hundred and fifty thousand dollars (($750,000) and also for punitive damages because of the willful and malicious nature of the discriminatory actions of Ms. Reinhart on behalf of GWUH as ratified and adopted and joined in by her superiors when they were apprised of those actions in an amount of no less than seven hundred and fifty-thousand dollars ($750,000).

Further the plaintiff prays that she be allowed and awarded all of her costs of preparing and pursuing this claim, to include exhausting her administrative remedies before the EEOC to include all counsel fees in accordance with the Laffey Matrix as provided for by statute and any expert witness fees that might have been required.

## VII. COUNT FOUR: RETALIATION IN THE FORM OF DISCHARGE STEMMING FROM THE DISCRIMINATION AGAINST PLAINTIFF BECAUSE OF HER DISABILITY, HER RACE AND HER AGE

55. Plaintiff incorporates herein by reference all the allegations from paragraphs 1 through 36 above as fully as if they were set out in this Count as well as the allegations of paragraphs 51 through 54 in Count Three above.

56. The hostile work environment maintained by Clial Beth Reinhart as adopted and ratified by her superiors as set out above continued unabated until the plaintiff drafted emails to Mr. Davis and Dr. Little as set out at which point, acting through Erin K. Fagan of the GWUH Human Resources Department in response to the emails of November, 2010 from the plaintiff as set out, GWUH retaliated against the plaintiff by firing her as a direct result of the discrimination against her and her seeking to end that discrimination.

WHEREFORE, the plaintiff prays in this Count Four for monetary damages in an amount of no less than two hundred and fifty thousand dollars ($250,000), damages for mental, emotional and psychological suffering in an amount of no less than one hundred thousand dollars ($100,000) and damages for pain and suffering in the amount of no less than seven hundred and fifty thousand dollars (($750,000) and also for punitive damages because of the willful and malicious nature of the discriminatory actions of Ms. Reinhart on behalf of GWUH as ratified and adopted and joined in by her superiors when they were apprised of those actions in an amount of no less than seven hundred and fifty-thousand dollars ($750,000).

Further the plaintiff prays that she be allowed and awarded all of her costs of preparing and pursuing this claim, to include exhausting her administrative remedies before the EEOC to include all counsel fees in accordance with the Laffey Matrix as provided for by statute and any expert witness fees that might have been required.

## VIII. COUNT FIVE: CONTINGENT PENDANT COUNT FOR WRONGFUL DISCHARGE UNDER DISTRICT OF COLUMBIA LAW

57. Plaintiff incorporates herein by reference all the allegations from paragraphs 1 through 36 above as fully as if they were set out in this Count as well as the allegations of paragraphs 51 through 54 in Count Three above and paragraph 56 in Count Four above.

58. The actions of the defendants in discharging the plaintiff in retaliation as the culmination of their exercise of their discriminatory intent against the defendant for her disability, her race and her age was in violation of the public policy as set out in the federal statutes set out above as well as the statutory law of the District of Columbia and as such was a wrongful discharge under District of Columbia law to be enforced only if the federal violations set out in the previous counts are not enforced and in which case this pendant count is then referred to or taken up in the municipal court system of the District of Columbia pursuant to the federal tolling statute.

WHEREFORE, the plaintiff prays in this contingent, pendant Count Five, should it proceed, for monetary damages in an amount of no less than two hundred and fifty thousand dollars ($250,000), damages for mental, emotional and psychological suffering in an amount of no less than one hundred thousand dollars ($100,000) and damages for pain and suffering in the amount of no less than seven hundred and fifty thousand dollars (($750,000) and also for punitive damages because of the willful and malicious nature of the discriminatory actions of Ms. Reinhart on behalf of GWUH as ratified and adopted and joined in by her superiors when they

were apprised of those actions in an amount of no less than seven hundred and fifty-thousand dollars ($750,000).

Further the plaintiff prays that she be allowed and awarded all of her costs of preparing and pursuing this claim, to include exhausting her administrative remedies before the EEOC to include all counsel fees in accordance with the Laffey Matrix and any expert witness fees that might have been required.

Respectfully submitted,

/s/

Laurence A. Elgin    Bar No. 159582
Counsel for Plaintiff
601 Pennsylvania Avenue, NW
Suite 900 South Building
Washington DC 20004-2601
(202) 628-1114
lmailto:awnet.lae@gmail.com

JURY DEMAND

The plaintiff hereby demands, pursuant to the Constitution of the United States, trial by jury on all issues so triable.

/s/

_____
Laurence A. Elgin