UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| KAREN SCOTT,<br><br>        Plaintiff,<br><br>    v.<br><br>DISTRICT HOSPITAL PARTNERS, L.P.<br>& UHS OF DELAWARE, INC.,<br><br>        Defendants. | Case No. 1:13-cv-00600 (CRC) |

**MEMORANDUM OPINION**

Karen Scott, an African-American woman and former Case Management Associate at George Washington University Hospital, brings suit under Title VII of the Civil Rights Act, claiming that she was terminated and subjected to a hostile work environment because of her race.[1] After discovery, it is clear that, in November 2010, the hospital notified Scott that it would be eliminating her position due to a departmental reorganization. Open to dispute is whether that reorganization was, indeed, the actual reason for Scott's termination. But there is simply no reliable evidence that the termination, or any of the hostile behavior Scott alleges, was based on her race. Accordingly, the hospital is entitled to summary judgment.

**I.   Background**

Scott began work for the hospital on a temporary basis in August 2006. Pl.'s Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n"), Ex. 1 ¶ 3. Roughly a year later, Clial Beth Reinhart—the Case Management Director at the hospital—interviewed Scott for a full-time Case Management

---

[1] Scott brought other claims, as well, but those were dismissed on the hospital's motion. See Scott v. Dist. Hosp. Partners, L.P., 60 F. Supp. 3d 156 (D.D.C. 2014) ("Scott I").

1

Associate position.  Def.'s Mem. Supp. Mot. Summ. J. ("Def.'s MSJ"), Ex. 2.  In a post-interview response sheet recommending that Scott be hired, Reinhart gave Scott top marks in various experience, education, job knowledge, and skills categories, and offered the following general appraisal of her candidacy:  "I have worked with [Scott] since [October] 2006 and have hands[-]on experience [with] the quality of her work.  She is highly qualified."  Id.  Scott was hired for the position the following month, in August 2007.  Pl.'s Opp'n, Ex. 1 ¶ 3.  She would be supervised by Reinhart, and would be tasked with the "effective communication of information to and from insurance representatives, physicians, patients, families, and the healthcare team," including the processing of insurance claims.  Def.'s MSJ, Ex. 1.

The working relationship between Scott and Reinhart got off to a harmonious start.  In a glowing introductory evaluation completed in November 2007, Reinhart gave Scott the highest rating possible on nearly every performance benchmark, and noted—among numerous other positive remarks—that Scott "clearly strive[d] for excellence in her work" and had been "key to the [department's] success."  Def.'s MSJ, Ex. 3.  For her part, Scott wrote: "I love my job [and] my supervisor!"  Id.  This mutual admiration persisted.  On an April 2008 evaluation, Reinhart again gave Scott near-perfect ratings and laudatory written feedback—describing her as "responsible," "reliable," "efficient[]," and "cheerful[]"—and Scott again expressed exuberant satisfaction with her job and supervisor ("I adore my job; and I love [Reinhart's] management style.  She is very motivational!").  See Def.'s MSJ, Ex. 4.  There were fewer comments on subsequent evaluations, but Scott's ratings did not taper until 2010, and even then they remained at or above a "competent" level.  Def.'s MSJ, Exs. 5–7.  Reinhart approved pay raises for Scott in 2008, 2009, and 2010.  See Def.'s MSJ, Exs. 8–9, 15.

Somewhere along the line, however, Scott's relationship with Reinhart soured.  One possible turning point was Reinhart's purported response to Scott's complaint, in May 2009, that three of her co-workers were practicing witchcraft, causing black dust or "goo" to emanate from the office's air vents.  See Def.'s MSJ, Ex. 12 ("First Scott Dep.") 123–37.  According to Scott, Reinhart's initial reaction to this complaint was to "start[] screaming and hollering." Id. at 132:11–15.  Later, Reinhart offered to modify Scott's work station and to have maintenance check the vents, but in Scott's view that follow-up never happened.  Id. at 133:4–14.  Scott complains of another incident, in early 2010, where Reinhart supposedly started opening filing cabinet drawers near Scott's desk, "screaming" about how things were not properly organized, and telling Scott that she was crazy.  Def.'s MSJ, Ex. 10 ("Second Scott Dep.") 132–33.  And several months later, in April 2010, Reinhart supposedly "screamed at [her] again . . . for propping open the door between the Case Management and Nursing office," which was secured with a code lock that Scott contends was "malfunctioning."  Pl.'s Opp'n, Ex. 1 ¶ 22.  According to Reinhart's divergent version of events—which she recorded in an incident report—Reinhart merely asked Scott why the door was ajar.  Def.'s MSJ, Ex. 11.  (In the report, Reinhart explains that the "door should never be propped open as it has a coded . . . entrance key pad [with a code known only by] employees who work in the case management area." Id.)  Scott's response to the inquiry was "argumentative and confrontational":  She cited the need for air circulation, suggested that Reinhart should "call [her] attorney," and initially ignored Reinhart's request that she go home for the day in light of her defiant behavior.  Id.

Aside from these alleged incidents of "screaming," Scott complains about other kinds of unpleasant treatment by her supervisor.  Reinhart apparently "threw mail" in Scott's direction (it is unclear whether the mail was thrown at Scott or merely on her desk), see Second Scott Dep.

3

147:6–148:15; Pl.'s Opp'n, Ex. 1 ¶ 11, and she made comments at departmental meetings that Scott felt were "belittl[ing]," Second Scott Dep. 142:17–143:16. Reinhart also allegedly requested access to Scott's email account so that she could monitor administrative communications while Scott was out of the office, id. 101:5–17; permitted another employee but not Scott—at least at first—to work overtime, Pl.'s Opp'n, Ex. 1 ¶ 9; stopped telling Scott the time and location of weekly department meetings, id. ¶ 15; and "call[ed] Scott into her office for anything, including minor matters and matters that were not part of [Reinhart's] responsibilities," id. ¶ 23.[2]

The relationship between Scott and Reinhart had clearly deteriorated, then, by November 2010, when Scott was terminated. See Def.'s MSJ, Ex. 17. However, the hospital does not suggest that Scott's firing was prompted by the relationship breakdown with her supervisor, Scott's bizarre accusations against her colleagues, or any deficiency in Scott's performance. Rather, the hospital claimed then—and maintains now—that Scott was terminated due to the hospital's reorganization of its case management department, which resulted in replacing Scott's position with one requiring a Registered Nursing ("RN") degree. See Def.'s MSJ, Exs. 16–17. As Scott understands it, however, "there was no business reorganization"; the stated plan was merely a "ruse"—or pretext—for the termination. Pl.'s Opp'n, Ex. 1 ¶¶ 29–30. In support of that view, Scott points to two employment listings, posted online by the hospital in July 2015, which advertise open Case Management Associate positions for which no RN degree is required. See Pl.'s Opp'n, Exs. 1A & 1B. According to Scott, "[t]his proves that the so-called business reorganization was a pretext[.]" Pl.'s Opp'n, Ex. 1 ¶ 38.

---

[2] Scott has also complained about not being approved for tuition benefits, but she concedes that Reinhart signed off on Scott's application. Second Scott Dep. 30:15–21.

4

Scott's characterization of the hospital's *actual* motivation behind her firing, however, has varied.  Between January 2011 and January 2013, Scott brought a series of charges before the Equal Employment Opportunity Commission ("EEOC"), challenging her termination on the grounds of race, religion, age, and disability discrimination, and eventually also alleging retaliation and hostile work environment.  See Scott v. Dist. Hosp. Partners, L.P., 60 F. Supp. 3d 156, 160–61 (D.D.C. 2014) ("Scott I") (summarizing EEOC charges).  In April 2013, after the EEOC dismissed Scott's various charges, she filed a five-count complaint in this Court, naming as Defendants the hospital's owner, District Hospital Partners, L.P., and management company, UHS of Delaware, Inc. (collectively, the "hospital").  Compl. ¶¶ 4–5.  Scott brought claims under the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101; Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e; and wrongful termination under D.C. common law.  In particular, Scott alleged that the departmental reorganization was "a false pretext for discharging her in retaliation for [her] having insisted on an accommodation" (propping open the door) for her "disability" (shortness of breath, exacerbated by black dust from the air ducts).  Compl. ¶¶ 21, 32.  However, in the same complaint, Scott also alleged that her termination had been the product of race-based discrimination.  "Reinhart," she claimed, "systematically discriminated against [her] and at least four others based on their race or national origin, to assure that they were let go from [the hospital] and replaced with non-minority individuals"—"a white RN" in Scott's case.  Id. ¶ 32, 46.  And she also alleged facts supposedly suggesting a race-based hostile work environment—such as an instance where Reinhart gave a white employee more opportunities for overtime pay.  Id. ¶ 24.

The hospital moved to dismiss all of Scott's claims, save her allegation of race-based termination.  The Court granted the hospital's motion in part, dismissing the disability-related

5

claims largely because Scott had failed to show that her alleged breathing difficulty was a recognized disability under the ADA.  See Scott I, 60 F. Supp. 3d at 164.[3]  However, noting that Scott's allegations related to her race-based hostile work environment claim were "lacking in detail" but "just barely sufficient to satisfy" her pleading burden, the Court permitted that claim to proceed.  Id. at 165.  Accordingly, discovery commenced on two claims: that Scott's termination was race-based, and that she had been subject to a hostile work environment because of her race.

The hospital has now moved for summary judgment on these remaining claims.  Regarding the termination claim, the hospital contends that Scott has not produced sufficient evidence to dispute its legitimate explanation for her termination, i.e., that it resulted from a departmental reorganization and the consequent elimination of Scott's position.  And the hospital argues that Scott cannot succeed on her hostile work environment claim because the record does not reveal her working conditions to have been sufficiently severe or abusive, or that any of the alleged hostility was racially motivated.  Scott responds by citing the two Case Management Associate job postings discussed above, as well as three declarations, including her own, that were submitted following the close of discovery.  With few exceptions, the assertions contained in these declarations are either vague and conclusory; seemingly unsupported by the declarant's personal knowledge; irrelevant to any material fact; or simply so bizarre as to be beyond reasonable belief.  As discussed in more detail below, Scott has not produced evidence that would permit a reasonable juror to conclude that she was fired on account of her race.  Nor has

---

[3] The Court also dismissed Scott's wrongful termination claim because such a claim may not be grounded solely on the violation of federal statutes with their own express remedies.  See Scott I, 60 F. Supp. 3d at 165.

she shown that any hostility on the part of her supervisors was racially motivated.  The Court will, accordingly, grant summary judgment for the hospital.

## II. Legal Standards

A court must grant summary judgment if the movant "shows that there is no genuine dispute as to any material fact," such that "judgment as a matter of law" is proper.  Fed. R. Civ. P. 56(a).  A *material* fact is one that could affect a suit's outcome under the relevant law, and a *genuine* dispute is one that a reasonable juror could resolve in favor of the nonmovant.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986).  "[A] party seeking summary judgment . . . bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact."  Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986).  But "after adequate time for discovery and upon motion," a court must enter summary judgment "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."  Id. at 322.

While a party may, of course, cite to affidavits or declarations in support of its motion or opposition, see Fed. R. Civ. P. 56(c)(1)(A), such materials must "be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."  Fed. R. Civ. P. 56(c)(4).  It follows that "affidavits based upon [mere] belief are inadequate" at this litigation stage, Harris v. Gonzales, 488 F.3d 442, 446 (D.C. Cir. 2007) (citing Londrigan v. FBI, 670 F.2d 1164, 1174 (D.C. Cir. 1981)), and that "'sheer hearsay' . . . 'counts for nothing' on summary judgment," Greer v. Paulson, 505 F.3d 1306, 1315 (D.C. Cir. 2007) (quoting Gleklen v. Democratic Cong. Campaign

Comm., Inc., 199 F.3d 1365, 1369 (D.C. Cir. 2000)).  While evidence need not be "in a *form* that would be admissible at trial, the evidence still must be capable of being converted into admissible evidence."  Gleklen, 199 F.3d at 1369.  Moreover, self-serving allegations that are "generalized, conclusory and uncorroborated" do not establish a triable factual issue, at least where one would reasonably expect to see corroboration.  Smith v. Lynch, 106 F. Supp. 3d 20, 38 (D.D.C. 2015) (quoting Akridge v. Gallaudet Univ., 729 F. Supp. 2d 172, 183 (D.D.C. 2010)).  These requirements all further the overriding objective of summary judgment, which is "to prevent unnecessary trials."  Gleklen, 199 F.3d at 1369.

### III. Analysis

Scott claims that her termination was racially motivated, and that she was subject to a hostile work environment because of her race, all in violation of Title VII.  The Court will consider each claim in turn.

#### A. Race-Based Termination

Under Title VII, it is unlawful for "an employer . . . to discharge any individual . . . because of such individual's race[.]"  42 U.S.C. § 2000e-2.  The parties have devoted considerable portions of their briefs to the question of whether Scott has established a prima facie case of discrimination under the familiar McDonnell Douglas framework.  See McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973).  But because the hospital has "assert[ed] a legitimate, non-discriminatory reason" for Scott's discharge, "the question whether [Scott] actually made out a prima facie case is 'no longer relevant' and thus 'disappear[s]' and 'drops out of the picture.'"  Brady v. Office of Sergeant at Arms, 520 F.3d 490, 493 (D.C. Cir. 2008) (quoting St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 510, 511 (1993); Reeves v. Sanderson Plumbing Prods., Inc., 530 U.S. 133, 143 (2000)).  Accordingly, the Court "need not—and

should not—decide whether the plaintiff actually made out a prima facie case under McDonnell Douglas." Brady, 520 F.3d at 494. Rather, that "framework falls away[,] and the court must decide one ultimate question: 'Has the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason [for the termination] was not the actual reason[,] and that the employer intentionally discriminated against the employee[?]'" DeJesus v. WP Co. LLC, 841 F.3d 527, 532–33 (D.C. Cir. 2016) (quoting Brady, 520 F.3d at 494). That "ultimate question" has two dimensions: the first focused on whether the proffered reason is genuine, the second on whether the actual reason was discrimination.

As for the authenticity of the stated basis for termination: The hospital maintains that Scott was terminated because "the Case Management Department was reorganized [in November 2010], resulting in the elimination of the Case Management Associate position." Def.'s MSJ 3. Supporting that rationale is a one-page document, apparently drafted by Reinhart, dated November 2010, and entitled "Project Plan for Case Management Services." Def.'s MSJ, Ex. 16. The document notes that due to "the increase in electronic systems, the need for the case management associate functions has decreased," and that "[w]ith the increase of [f]ederal and state regulatory oversight for quality/utilization reimbursement, there is a need for an expert RN Case Manager to assure compliance to our payor regulations." Id. The document then makes clear that this "RN Case Manager" will replace "the Case [M]anagement Associate Position (Karen Scott)," thus resulting in that position's "[e]limination." Id. Finally, the document emphasizes once again that the proposed change addresses the need for "a higher level of expertise in utilization management processes," in particular an "advanced knowledge in [f]ederal and District of Columbia regulations as [they] relate[] to the revenue cycle." Id. The only other record evidence suggesting that the reorganization was the basis for Scott's discharge

9

is the notice of termination itself. In a letter to Scott, the hospital's Assistant Director of Human Resources explained that Scott's position was being eliminated because "[t]he hospital [was] in the process of reorganizing and redesigning the way it delivers its services." Def.'s MSJ, Ex. 17.

Needless to say, these rather opaque statements raise significant questions as to the scope, nature, and rationale of the supposed reorganization. First, was this truly a department-wide organization as the hospital describes, see Def.'s MSJ 16 (referencing the hospital's "decision to reorganize an *entire* department"), or was the "reorganization" limited to the elimination of a single position, as the Project Plan document suggests, see Def.'s MSJ, Ex. 16 (referencing only the elimination of Scott's position)? Second, what is the rational connection between the skills and knowledge signaled by the RN credential—the purported reason why Scott was no longer qualified for her post—and the need for someone with "a higher level of expertise in utilization management processes" and "advanced knowledge" of local and federal healthcare regulations? See id. One might expect to see an affidavit or deposition testimony from those behind the reorganization, resolving some of these head-scratching ambiguities. The record contains nothing of the sort.

The record does contain, however, two July 2015 employment listings for open Case Management *Associate* positions at the hospital—no RN degree required. See Pl.'s Opp'n, Exs. 1A & 1B. This, of course, casts some suspicion on the hospital's 2010 case management reorganization, purportedly grounded in the need for RN case managers rather than non-RN case management associates.[4] No doubt, the existence of the 2015 ads does not require concluding

---

[4] In her affidavit, Scott also alleges that she was replaced by a "young white man" who lacked an RN. See Pl.'s Opp'n, Ex. 1 ¶¶ 33–34. But this allegation has no clear basis in personal knowledge, and it directly contradicts Scott's complaint, which alleged that she was replaced with a "white RN." Compl. ¶ 32. The Court will therefore disregard this recent allegation as unsubstantiated.

that the 2010 plan was pretextual.  Perhaps the hospital struggled to find RN-qualified case managers after implementing the 2010 plan, and decided to revert to the old case management structure.  See Def.'s Reply Supp. MSJ ("Def.'s Reply") 4 ("[D]epartmental staffing changes . . . may have been implemented over the course of the intervening four and a half years.")  Or maybe the hospital's 2010 plan sought merely to increase the number of RN case managers, not to eliminate totally non-RN case management associates.[5]  These explanations are possible.  But the 2015 ads, combined with the numerous, unexplained gaps in the hospital's reorganization rationale, certainly create a genuine dispute as to whether the hospital's stated reason for Scott's termination was indeed the actual reason.

That conclusion does not end the inquiry, however.  Scott must point to evidence showing not only that the hospital's stated basis for her termination was pretextual, but also that the real reason was unlawful—namely, that it was the product of racial discrimination.  See St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 515 (1993) (plaintiff employee must show "*both* that the [employer's stated] reason was false, *and* that discrimination was the real reason").  Scott has attempted to carry this burden by pointing to assertions in three declarations, all of which were completed after the filing of the hospital's summary judgment motion.  See Pl.'s Opp'n, Exs. 1–3.  The Court notes these declarations are marked by signs of unreliability, including assertions

---

[5] The hospital also notes that the positions advertised in the 2015 listings required a bachelor's degree, which Scott does not have.  See Def.'s Reply 4.  But that is irrelevant to the stated rationale for the reorganization, which is that additional case managers *with RN degrees* were needed.  See Def.'s MSJ, Ex. 16.  Indeed, "shifting and inconsistent justifications are 'probative of pretext.'"  Geleta v. Gray, 645 F.3d 408, 413 (D.C. Cir. 2011) (quoting EEOC v. Sears Roebuck & Co., 243 F.3d 846, 853 (4th Cir. 2001)).  Separately, the hospital argues—without citation—that Scott "cannot establish a foundation for the admission of these documents into evidence."  Def.'s Reply 4.  But the proper foundation could be established at the time of trial.  See Gleklen, 199 F.3d at 1369 (any facts "capable of being converted into admissible evidence" may be considered at summary judgment).

contradicting those made within the same affidavit, compare Pl.'s Opp'n, Ex. 1 ¶ 8 (asserting that "all" case management unit social workers were white "except one") with id. ¶ 16 (asserting that "all" such workers were white, without exception); assertions that repeat—near-verbatim— assertions made in other affidavits, compare Pl.'s Opp'n, Ex. 1 ¶ 7 with Pl.'s Opp'n, Ex. 2 ¶ 7; and assertions that contain in brackets what appear to be leading instructions from Scott's counsel to the affiants, see, e.g., Pl.'s Opp'n, Ex. 1 ¶¶ 7, 10, 13.

The lengthiest declaration is Scott's own. See Pl.'s Opp'n, Ex. 1. In it, she alleges that Reinhart took a number of racially-motivated adverse actions against African-American employees at the hospital: in particular, that Reinhart "systematically, one by one, got rid of black, or . . . dark-skinned, Utilization Review Nurses, and also the black department secretary," id. ¶ 17; that Reinhart "moved all the black nurse[s]" in a nearby department "across the street," id. ¶ 21; that Reinhart "started to track where every black employee was at all times" and "ordered all . . . black employees to put [their] purses [including their house keys] in supposedly locked drawers," id. ¶ 12; and that as a result, black employees "complained of thefts from purses and homes" and "woke up in the morning with strange bruising on their thighs," id.

Under the standards applicable on summary judgment, these statements must be disregarded on numerous grounds.[6] First, nearly all of the above statements are self-serving and uncorroborated, even though they constitute the very type of testimony—given the number of individuals implicated—for which "corroborating evidence should be readily available." Smith,

---

[6] The hospital argues that "[a]lleged maltreatment of others cannot be the basis of [Scott's] disparate treatment claim." Def.'s Reply 6. Not so: "A plaintiff may support an inference that her employer's stated reasons . . . were pretextual by citing a number of possible sources of evidence, including 'the employer's better treatment of similarly situated employees outside the plaintiff's protected group [and] the employer's pattern of poor treatment of other employees in the same protected group as the plaintiff[.]" Wheeler v. Georgetown Univ. Hosp., 812 F.3d 1109, 1115 (D.C. Cir. 2016).

106 F. Supp. 3d at 37 (quoting Fields v. Office of Johnson, 520 F. Supp. 2d 101, 105 (D.D.C. 2007)). Those assertions therefore cannot "create genuine issues of material fact[.]" Id. Second, many of the assertions are so vague and conclusory that they cannot be trusted. For instance, it is not clear during what time period Reinhart allegedly took these adverse actions, and specifics—such as the number of employees affected—are lacking. Relatedly, due to their vagueness, the Court cannot ascertain whether the assertions, most of which describe the experiences of *other* employees, are based on hearsay or Scott's own personal knowledge. (Some of the alleged incidents may even have occurred after Scott's termination.) Finally, some of Scott's allegations are simply so bizarre—including the notion of a conspiracy on the part of Reinhart to burgle the homes of African-American employees by requiring that they keep their purses in unlocked drawers—that they are beyond the pale of reasonable belief.[7]

Excluding Scott's broad-brush assertions regarding Reinhart's treatment of other African-American employees, the Court is left with the assertions set forth in declarations from two of the hospital's former employees. The first is from Beverly Boykin, an African-American who worked in the Case Management Department under Reinhart's supervision from September 2007 through May 2008. See Pl.'s Opp'n, Ex. 2 ¶ 3. Boykin primarily complains that Reinhart gave two white social workers at the hospital flexible working hours arrangements, but was not

---

[7] A handful of the assertions in Scott's declaration relate specifically to her *own* treatment by Reinhart. See Pl.'s Opp'n, Ex. 1 ¶¶ 9, 11–12, 13, 15, 23. By and large, these assertions are both milder and more specific (though still far from detailed) as compared to Scott's assertions regarding Reinhart's treatment of all African-American employees. For instance, Scott alleges that Reinhart "stopped telling [her] when and where . . . weekly meetings were being held," id. ¶ 15, and that Reinhart would "call[] [Scott] into her office for anything, including minor matters," id. ¶ 23. However, as discussed below, see infra section III.B, these incidents generally do not evidence racial motivation. Scott does allege that Reinhart gave a white employee more favorable overtime opportunities, but that employee apparently had a different position, and Scott acknowledges later being given those same overtime opportunities. See id. ¶ 8–9.

similarly flexible with Boykin's schedule. See id. ¶¶ 5–6, 10.  As the hospital points out, however, because these employees have different job titles and duties, they are not similarly situated to Boykin, and therefore cannot properly ground an inference of discrimination.  See Burley v. Nat'l Passenger Rail Corp., 801 F.3d 290, 301 (D.C. Cir. 2015) (noting that, to rely on comparator evidence to show pretext, a plaintiff must show that "all of the relevant aspects" of the relevant "employment situation[s] were nearly identical").  Other assertions in Boykin's affidavit, moreover, suggest that her treatment by Reinhart was personal—not based on race. See, e.g., Pl.'s Opp'n, Ex. 2 ¶ 5 ("I spoke with several other African-American co-workers and one white co-worker about [Reinhart] going through my email, [and] they told me she'd never done that to them."); id. ¶ 11 ("[Reinhart] had not given the rest of the staff the same orders she was giving me.").

Scott submits a final declaration from Wayne Monk, Sr., an African-American former pharmacy technician at the hospital.  See Pl.'s Opp'n, Ex. 3 ¶¶ 3, 6.  He recounts an incident where he walked near the nurses' lounge, an area where Reinhart was present, to see the progress of some remodeling.  Id. ¶¶ 7–8.  Monk claims that Reinhart approached him and "said in a very nasty, malicious[,] and offensive tone: 'You people don't belong here.'"  Id. ¶ 9.  Monk spoke to Human Resources about the remark—which he interpreted as being directed at African-Americans—and two days later, he "received a card" from Reinhart, apologizing for offending him and explaining that "it was not her intent to do so."  Id. ¶¶ 18–19.  For a number of reasons, these allegations simply cannot make it a matter of genuine dispute whether Scott was terminated based on her race.  Given that Monk was in an area designated for nurses, and that there were numerous African-American nurses as alleged by Scott and Boykin, it is highly likely that Reinhart's comment referenced non-nurses rather than African-Americans.  Even under the

unlikely assumption that the comment was racially tinged, it was isolated, directed at an employee other than Scott, and spoken on an unidentified past date. Its evidentiary value is therefore highly attenuated.

All in all, the *admissible* and *reliable* evidence suggesting that Scott's termination was based on her race is slim to nonexistent. And on the other side of the scale, there is strong, affirmative evidence that Reinhart harbored no racial animus towards Scott. As previously discussed, Scott obtained her permanent position in 2007 *at Reinhart's recommendation*—and a glowing recommendation at that. See Def.'s MSJ, Ex. 2. In evaluations over the next few years, Reinhart praised Scott's work, often giving her the highest of marks on various performance benchmarks. See Def.'s MSJ, Exs. 3–7. Scott, in turn, lauded her supervisor. Def.'s MSJ, Ex. 3–4. And Reinhart raised Scott's hourly wage in 2008, 2009, and 2010. See Def.'s MSJ, Exs. 8–9, 15. No reasonable juror—on this record—could conclude that the same supervisor who recommended Scott for hire, praised Scott, and raised Scott's salary, then went on to fire Scott because of her race.

Because Scott has not pointed to evidence that would create a genuine dispute as to whether "discrimination was the real reason" for her termination, St. Mary's Honor Ctr., 509 U.S. at 515, the Court will grant summary judgment for the hospital.

B. Hostile Work Environment

The Court next considers Scott's claim that she was subject to an unlawful hostile work environment. Title VII—in addition to prohibiting discriminatory hiring, termination, and compensation—"strike[s] at the entire spectrum of disparate treatment . . . in employment," such that an employee may not lawfully be "requir[ed] . . . to work in a discriminatorily hostile or abusive environment." Harris v. Forklift Sys., Inc., 510 U.S. 17, 21 (1993) (quoting Meritor

Savings Bank, FSB v. Vinson, 477 U.S. 57, 64 (1986)).  As reflected in the language of the standard, to establish a successful claim, an employee must show that the work environment in question was both discriminatory and actually abusive.  "[C]ourts have routinely held that hostile behavior, no matter how unjustified, cannot support a hostile work environment claim unless that behavior is linked to the plaintiff's membership in a protected class." Slate v. Pub. Def. Serv. for the D.C., 31 F. Supp. 3d 277, 303 (D.D.C. 2014) (citing Na'im v. Clinton, 626 F. Supp. 2d 63, 73 (D.D.C.2009); Kline v. Springer, 602 F. Supp. 2d 234, 243 (D.D.C. 2009)).  Put another way, under these circumstances, "it must be clear that the [alleged] hostile work environment was the result of discrimination based on" race.  Lester v. Natsios, 290 F. Supp. 2d 11, 22 (D.D.C. 2003).

As detailed above, Scott alleges that Reinhart took a number of hostile and potentially abusive actions against her, such as: "screaming" at Scott for seeking to prop open a secured door and for failing to properly organize her files; "throwing" mail on Scott's desk; and making "belittling" comments at departmental meetings (or failing to disclose the time and location of those meetings).  But there is no evidence that any of these allegedly hostile encounters had a racial dimension.[8]  Accordingly, even assuming that the incidents Scott alleges are severe or abusive enough to be unlawful, Scott has not shown that this "behavior [wa]s linked to [her] membership in a protected class," i.e., to her race.  Slate, 31 F. Supp. 3d at 303.  The Court will, accordingly, grant summary judgment to the hospital on this claim.

---

[8] Scott's assertion that Reinhart gave more overtime hours to a white employee does implicate race, see Pl.'s Opp'n, Ex. 1 ¶ 9, but Scott has not demonstrated that the employee is a proper comparator.  See Burley, 801 F.3d at 301.

## IV. Conclusion

For the reasons outlined above, the Court will grant the hospital's Motion for Summary Judgment.  An appropriate Order accompanies this Memorandum Opinion.

*/s/ Christopher R. Cooper*
CHRISTOPHER R. COOPER
United States District Judge

Date: December 29, 2016